# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

ALBERTO MACIEL-ALCALA, AKA
Ramon Alfredo Ramirez,
            *Defendant-Appellant.*

No. 09-50038

D.C. No.
2:08-cr-00395-
CAS-1

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
August 6, 2009—Pasadena, California

Filed March 25, 2010
Amended July 21, 2010

Before: William C. Canby, Jr., Kim McLane Wardlaw and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Wardlaw

10365

## COUNSEL

Sean K. Kennedy and Alexandra W. Yates, Federal Public Defenders, Los Angeles, California, for the defendant-appellant, Alberto Maciel-Alcala.

Thomas P. O'Brien, Christine C. Ewell, and Yvonne L. Garcia, United States Attorneys, Los Angeles, California, for the plaintiff-appellee, United States of America.

## ORDER

Appellant's petition for panel rehearing is granted. The prior opinion filed on March 25, 2010, and reported at 598 F.3d 1239, is vacated concurrent with the filing of an Amended Opinion today.

With this amendment, the panel has unanimously voted to reject appellant's suggestion for rehearing en banc. Judges Wardlaw and Callahan vote to reject the suggestion for rehearing en banc, and Judge Canby so recommends.

The full court has been advised of the suggestion for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

No petitions for panel rehearing or rehearing en banc may be filed with respect to the Amended Opinion. *See* 9th Cir. G.O. 5.3(a)

IT IS SO ORDERED.

## OPINION

WARDLAW, Circuit Judge:

Alberto Maciel-Alcala ("Maciel") appeals his conviction of two counts of aggravated identity theft under 18 U.S.C.

§ 1028A for using a birth certificate belonging to "another person" to procure a U.S. passport in the name of Ramon Ramirez. Having illicitly obtained a U.S. passport, Maciel used it to falsely claim U.S. citizenship upon his arrival from Guadalajara, Mexico, at the Los Angeles International Airport. Maciel moved for judgment of acquittal, contending that the government was required to prove that Maciel knew that Ramon Ramirez was a living person when he obtained Ramirez's birth certificate and used it to obtain the passport. The district court denied the motion, and Maciel appeals. Because we agree with the district court that the scienter element of 18 U.S.C. § 1028A requires that the government prove only that Maciel knew that Ramirez was a real person, living or deceased, when he procured the passport using Ramirez's birth certificate, we affirm.

## I.

Maciel is a Mexican citizen who had been living in the United States under the stolen identity of Ramon Ramirez, a man with whom Maciel was not acquainted. Maciel used Ramirez's identity to purchase a truck, rent an apartment, secure loans, and obtain several cellular telephone accounts. He also used Ramirez's identity to obtain a California identification card, birth certificate, and Social Security card, all of which were issued in Ramirez's name. In August 2004, Maciel used these documents to procure a U.S. passport, which he later used to travel to Mexico. On March 17, 2008, Maciel was arrested by U.S. Customs and Border Protection ("Customs") officials for attempting to use the fraudulently obtained passport to reenter the U.S. and for falsely claiming U.S. citizenship on his Customs declaration.

The government indicted Maciel for making a false statement in his passport, 18 U.S.C. § 1542, for falsely representing himself as a U.S. citizen to Customs, 18 U.S.C. § 911, and for two counts of aggravated identity theft in connection with the underlying counts in violation of 18 U.S.C.

§ 1028A(a)(1). Section 1028A(a)(1) provides an additional two years of incarceration for anyone who "during and in relation to any felony" enumerated in the statute, two of which are Maciel's underlying offenses, "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person."

Maciel pled guilty to the § 911 and § 1542 charges and waived his right to a jury trial on the aggravated identity theft counts. During the bench trial, a supervisor from the Orange County Clerk Recorder's Office testified that on February 19, 2004, a person representing himself to be Ramon Alfredo Ramirez applied for and was given a copy of his birth certificate. The real Ramirez, who was alive and well and residing in Arizona, testified that he never requested a copy of his birth certificate from Orange County, where he was born. Nor did he authorize Maciel to request a copy of this birth certificate. Maciel did not contest this evidence, but stipulated that (1) he had applied for a passport in Ramirez's name and presented a copy of Ramirez's birth certificate in support of his application on August 11, 2004, and (2) he had presented the passport to Customs officers when he reentered the U.S. on March 17, 2008.

Before closing argument, Maciel moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Drawing upon language from the Supreme Court's decision in *Flores-Figueroa v. United States*, 129 S. Ct. 1886 (2009), Maciel argued that, to secure the enhanced penalty under § 1028A, the government must prove that Maciel knowingly possessed, transferred, or used a means of identification of "another person" who he then knew to be a "live" person—as opposed to a "deceased" person. The government conceded that it could not prove that Maciel knew Ramirez was alive when he used Ramirez's birth certificate to obtain the passport. Holding that § 1028A requires the government to prove only that Maciel knew Ramirez was a real person, living or deceased, the district court denied Maciel's motion and

entered a guilty verdict on the two counts of aggravated iden-
tity theft.[1]

## II.

The district court had jurisdiction pursuant to 18 U.S.C.
§ 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.
We review de novo whether the district court correctly con-
cluded that the word "person" in § 1028A(a)(1) refers to both
living and deceased persons. *See Rodriguez v. Smith*, 541 F.3d
1180, 1183 (9th Cir. 2008) ("We review questions of statutory
interpretation *de novo*.").

## III.

In *Flores-Figueroa*, the Supreme Court addressed the ques-
tion of whether 18 U.S.C. § 1028A "requires the government
to show that the defendant *knew* that the 'means of identifica-
tion' he or she unlawfully transferred, possessed, or used, in
fact, belonged to 'another person.' " 129 S. Ct. at 1888. There
the Court rejected the argument that the phrase "another per-
son" included fictional persons as well as actual persons. *Id.*
at 1888-94. Maciel springboards from *Flores-Figueroa* to the
conclusion that not only does the statute require the govern-
ment to prove that the defendant knew that the means of iden-
tification belonged to another real person, but also that the
defendant knew that the other person was a living—as
opposed to a deceased—actual person. The *Flores-Figueroa*
decision, however, does not bear the weight Maciel would
assign to it.[2] We therefore must determine whether the word

---

[1]The district court sentenced Maciel to one month on each of the under-
lying convictions, to be served concurrently, followed by twenty-four
months on each of the aggravated identity theft convictions to be served
concurrently with each other but consecutively to the terms imposed for
the underlying convictions.

[2]Maciel directs us to an exchange between the government's counsel,
Justice Stevens, and Justice Kennedy during the oral argument of *Flores-*

"person" as used in § 1028A includes the living and the dead or whether Congress intended that the government must prove the defendant used the identification of a person he knew at the time was alive.

## A.

**[1]** As with all questions of statutory interpretation, we first turn to the plain language of § 1028A. *See United States v. Rosales*, 516 F.3d 749, 758 (9th Cir. 2008) ("[S]tatutory interpretation begins with the plain language of the statute." (internal quotation marks omitted)). "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 316 F.3d 913, 932 (9th Cir. 2003) (internal quotation marks omitted). Because the aggravated identity theft statute does not define the phrase "another person" or the word "person," *see* 18 U.S.C. § 1028(d) (defining certain other terms in § 1028A), we look to its ordinary meaning.

**[2]** Maciel argues that, as used in ordinary English, "another person" means "a living human being," while the government argues "another person" may mean someone either living or deceased. Although we agree that "dictionary definitions are cognizable" as tools for determining the ordinary

---

*Figueroa.* In that exchange, Justice Stevens suggested that at least he understood the word "person" to mean "living person." Transcript of Oral Argument at 26-27, *Flores-Figueroa*, 129 S. Ct. 1886 (2009) (No. 08-108), *available at* http://www.supremecourtus.gov/oral_arguments/argument_transcripts/08-108.pdf. This discussion, however, which involved a hypothetical question not before the Court, is of no precedential value. *See, e.g.*, *United States v. Bd. of Educ. of Chicago*, 799 F.2d 281, 285 n.3 (7th Cir. 1986) (noting that it is the judicial opinion which "stands as the sole expression of the court; statements made at oral argument do not determine the scope of an opinion unless explicitly incorporated into the opinion").

meaning of words used in a statute, *United States v. Banks*, 556 F.3d 967, 978 (9th Cir. 2009), here, such definitions admit of more than one interpretation. Some dictionary definitions, such as those cited by Maciel, specify that "person" means only "living person," while others, such as those cited by the government, encompass both living and deceased persons. For example, the American Heritage Dictionary's primary definition of person is "a living human being." American Heritage Dictionary 1310 (4th ed. 2000); *see also* 11 Oxford English Dictionary 597 (2d ed. 1989) (defining "person" as "[t]he living body of a human being"). In contrast, Webster's Third New International Dictionary defines "person" as both "a living individual unit" and as a "human being." Webster's Third New International Dictionary 1686 (2002); *see also* Merriam-Webster's Collegiate Dictionary 865 (10th ed. 2001) (defining "person" as "human, individual"). As reflected in those texts, depending on the context, the noun "person" properly may be narrowed by the adjectives "living" and "deceased."

Nor do legal definitions of the word "person" resolve the textual ambiguity. Black's Law Dictionary sets forth as its primary definition: "person—A human being"; the entry also includes the phrase "person not deceased," which is defined as "[a] person who is either living or not yet born." Black's Law Dictionary 1178 (8th ed. 2004).

The statutory usage of the word "person" is similarly unilluminating. It is a "well-established rule of construction that where Congress uses terms that have accumulated settled meaning under common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117 (9th Cir. 2007) (internal quotation marks omitted). State statutes define the word "person" variously to include persons who are alive or deceased.[3]

---

[3]*Compare* Alaska Stat. § 45.50.010 ("A mark may not be registered if it consists of or comprises . . . matter that may disparage or falsely suggest

Nor are federal statutes helpful in defining the word "person." Some statutes' use of the word "person" implies that, standing alone, "person" means "living person." The "cyberpiracy" statute, 15 U.S.C. § 8131, imposes civil liability upon "[a]ny person who registers a domain name that consists of the name of another living person . . . without that person's consent." *Id.* § 8131(1)(A). Because "that person" refers to "another living person," and because deceased persons cannot register domain names, in the cyberpiracy statute Congress must have intended that the word "person" mean "living person." *See also* 18 U.S.C. § 876(d) (imposing criminal and civil liability upon extortionists who send to "any other person" prohibited communications that contain "any threat to injure the property or reputation of the addressee or of another, or the reputation of a deceased person"). Other federal statutes imply that "person" may encompass both living and deceased persons. In particular, some federal statutes use the phrase "persons, living or dead." *See* 15 U.S.C. § 1052(a) ("No trademark . . . shall be refused registration . . . [c]onsists of or comprises . . . matter which may disparage or falsely suggest a connection with persons, living or dead . . . ."); 31 U.S.C. § 5112(l)(4)(E) ("No head and shoulders portrait or bust of any person, living

a connection with persons, living or dead . . . ."), Ariz. Rev. Stat. Ann. § 14-2603 (defining "devisee" to include "[a] person . . . who was deceased at the time the testator executed the will as well as a person . . . who was then living but who failed to survive the testator"), Cal. Penal Code § 530.55(a) (defining "person" as including "a natural person, living or deceased" in setting forth the definitions for "Crimes Against Property"), Or. Rev. Stat. § 165.800 ("'Another person' means a real person, whether living or deceased . . . ."), *and* Wash. Rev. Code § 63.60.020 ("'Individual' means a natural person, living or dead."), *with* Haw. Rev. Stat. § 707-700 (defining "person" as "a human being who has been born and is alive" in setting forth the definitions for "Offenses Against the Person"), *and* Idaho Code Ann. § 54-206 ("'Person' means any natural living person."). *Cf.* Nev. Rev. Stat. § 0.039 ("Except as otherwise expressly provided in a particular statute or required by the context, 'person' means a natural person . . . .").

or dead, and no portrait of a living person may be included in the design of any quarter dollar under this subsection.").

Maciel further contends that, under *Guyton v. Phillips*, 606 F.2d 248 (9th Cir. 1979), the "settled legal meaning" of the word "person" is "living person" and that Congress must have intended to incorporate *Guyton*'s definition into § 1028A under principles of statutory interpretation. *See Neder v. United States*, 527 U.S. 1, 21 (1999) (courts must infer that Congress intended to incorporate settled meaning of terms it uses). In *Guyton*, we held that the Civil Rights Act, 42 U.S.C. §§ 1983 and 1985, does not provide a cause of action on behalf of a deceased person based on alleged violations of the deceased person's civil rights which occurred after his death. Noting in passing that, "[g]enerally, the term 'person', as used in a legal context, defines a living human being and excludes a corpse or a human being who has died," *Guyton*, 606 F.2d at 250, we held that the definition of "person" for purposes of protection of civil or constitutional rights is limited only to a living human being, *id.* at 250-51.

*Guyton* is inapposite for three reasons. First, our observation in *Guyton* that the word "person" generally defines a living person and excludes the deceased did not hold that the word "person" has "accumulated [a] settled meaning under the common law," *Neder*, 527 U.S. at 21, such that Congress must have intended to incorporate it into § 1028A. To the contrary: our use of the word "generally" implies exceptions to the interpretation that "person" means "living person." Second, in *Guyton*, our holding extended only to sections 1983 and 1985 of the Civil Rights Act. Whereas one cannot violate a deceased person's civil or constitutional rights, *see Guyton*, 606 F.2d at 250, it is readily apparent from the facts of this very case that one can steal a deceased person's identity. Third, we also observed in *Guyton* that nothing in the legislative history of the Civil Rights Act indicated that Congress intended to include deceased persons in the definition of "person." Here, by contrast, there is evidence in the legislative

history that Congress intended that "person" embrace a broader meaning.

**[3]** In the absence of any controlling authority and because in both ordinary English and legal usage the word "person" can be used to refer to the living, the deceased, or both, we conclude that § 1028A(a)(1)'s use of the word "person" is ambiguous. We therefore look to other cannons of statutory interpretation to ascertain congressional intent.

## B.

Because Congress did not expressly indicate whether it intended the word person to mean only living persons in the text, we must turn to the structure of the statute. We do not examine the statutory provision in isolation, *Bodine v. Graco, Inc.*, 533 F.3d 1145, 1151 (9th Cir. 2008), but rather, read the words in a statute "in their context and with a view to their place in the overall statutory scheme," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000); *see also Holloway v. United States*, 526 U.S. 1, 7 (1999) ("[T]he meaning of statutory language, plain or not, depends on context." (internal quotation marks omitted)). An analysis of the overall scheme of the aggravated identity theft statute reveals that Congress intended that the word "person" include living and deceased persons.

**[4]** Both subsections (a)(1) and (a)(2) use the phrase "another person." We interpret identical phrases used in the same statute to bear the same meaning. *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (It is a "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." (internal quotation marks omitted)). In addition, the "close proximity" of two statutory provisions "presents a classic case for application of the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." *Comm'r v. Lundy*, 516 U.S. 235,

250 (1996) (internal quotation marks omitted). Therefore, the meaning of the phrase "another person" in subsection (a)(2) informs our interpretation of the phrase "another person" in subsection (a)(1).

**[5]** Subsection (a)(2) imposes a mandatory five-year sentence enhancement on anyone who "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person or a false identification document" during and in relation to certain enumerated terrorism-related felonies. 18 U.S.C. § 1028A(a)(2). "Means of identification" is defined to include any name or number (for example, social security numbers, dates of birth, passport numbers, and tax identification numbers) that may be used to identify a specific individual. *Id.* § 1028(d)(7) (setting forth the definition of "means of identification" for both sections 1028 and 1028A). If we interpret "person" under subsection (a)(2) to include only the living, a defendant could be found guilty under subsection (a)(2) for possessing a "false identification document" (such as a social security card) belonging to a deceased person, but not for using an identification number (such as a social security number) belonging to the same deceased person. We cannot conclude that Congress intended such an absurd result.

Maciel contends that such a result is in fact not absurd, arguing that Congress may well have determined that use of a false identification document poses a greater harm than use of a false identification number without supporting documentation. The statute itself defeats this argument, however, by providing identical penalties for the use of an identity number and the use of a false identity document where the predicate crime is terrorism. *Id.* § 1028A(a)(2). Had Congress determined that the use of a false identification document poses a greater threat of harm than the use of a false identification number without supporting documentation, we would expect that judgment to be reflected in differing penalties for the two crimes.

Similarly unavailing is Maciel's contention that "person" must refer only to living persons given that § 1028A(b) states that "a court shall not place on probation any person convicted of a violation of this section." *Id.* § 1028A(b)(1); *see also id*. § 1028A(b)(2) (discussing "term of imprisonment imposed on a person"); *id.* § 1028A(b)(4) (same). These sections, however, discuss the penalties to be imposed on a person who has been convicted of the crime. Maciel's suggestion that "person" here means "living person" because only living persons can be convicted proves too much. It is precisely because deceased persons cannot be convicted and thus subject to the statute's penalty provisions that it was unnecessary for Congress to limit the sentencing provisions of § 1028A to "living persons." *See United States v. Jimenez*, 507 F.3d 13, 19 n.6 (1st Cir. 2007) (noting that because the deceased cannot be sentenced, the word "person" in § 1028A(a)(1) is "free to take on the larger meaning"). By contrast, because the means of identification of deceased persons can be stolen and used unlawfully, had Congress used the phrase "living or deceased" in § 1028A(a)(1), it would have been surplusage.

The only other circuits to have addressed this question agree that the phrase "another person" refers both to living and deceased persons. In *United States v. Jiminez*, the First Circuit held that, because reading "another person" in § 1028A(a)(2) as encompassing only living persons would lead to absurd results, Congress could not have intended to so limit the definition in § 1028A(a)(1). 507 F.3d at 18-22. Similarly, in *United States v. Kowal*, 527 F.3d 741 (8th Cir. 2008), the Eighth Circuit held that it would be illogical to limit the phrase "another person" to living persons in subsection (a)(2) because Congress intended to "achieve broad coverage" in that subsection. *Id.* at 746-47. Noting that Congress used identical language in subsection (a)(1), the *Kowal* court concluded that Congress unambiguously intended that "another person" encompass both the living and the deceased. *Id.* at 747.

**[6]** Because the only logical reading of "person" in subsection (a)(2) encompasses both living and deceased persons, and

because Congress used the same word in the neighboring sub-section (a)(1), Congress must have intended that "person" in (a)(1) refers to both living and deceased persons.

## C.

The congressional purpose behind and legislative history of the aggravated identity statute only buttress our conclusion that Congress intended that the phrase "another person" include living and deceased persons. Section 1028A was enacted as part of the Identity Theft Penalty Enhancement Act, Pub. L. No. 108-275, 118 Stat. 831 (2004) (the "Act"). At a legislative hearing on the Act, Representative Adam Schiff, one of the bill's co-sponsors, stated:

> In section A where the offenses are defined, it refers to a means of identification of another person. I take it by the choice of that language that these enhance-ments apply when the fraudulent identification is that of another existing person, either live or deceased, but an actual individual, so in the case of a garden-variety immigration case where somebody fabricates an identity card out of whole cloth, not referring to any other person but merely invents a persona, that that would not be included within the sweep of this.

*Identity Theft Penalty Enhancement Act, and the Identity Theft Investigation and Prosecution Act of 2003: Hearing on H.R. 1731 and H.R. 3693 Before the Subcomm. on Crime, Terrorism, and Homeland Sec. of the H. Comm. on the Judiciary*, 108th Cong., 2d Sess. 32 (2004) (statement of Rep. Schiff, Member, House Comm. on the Judiciary). "Although the statements of one legislator made during debate may not be controlling," *North Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 526 (1982), Representative Schiff's remarks, as those of the Bill's cosponsor, are "clearly probative of a legislative judg-ment" and are therefore "entitled to weight," *Simpson v.*

*United States*, 435 U.S. 6, 13 (1978); *see also Bell*, 456 U.S. at 526-27 (noting that the "remarks . . . of the sponsor of the language ultimately enacted . . . are an authoritative guide to the statute's construction").

In addition, the purpose of the Act is to "address[ ] the growing problem of identity theft." H.R. Rep. No. 108-528, at 3 (2004), *reprinted in* 2004 U.S.C.C.A.N. 779, 780. In enacting the statute, Congress sought to protect businesses from financial loss and the nation from terrorist threats. *See id.* at 780-81. Section 1028A is intended to make it "easier for prosecutors" to prosecute defendants and to stiffen penalties to deter identity theft. *Id.* at 786.

**[7]** Reading the phrase "another person" to encompass both living and deceased persons is consistent with Congress' goal of deterring defendants from engaging in identity theft and magnifying that crime by using the stolen identification for further unlawful purposes. To an offender, an identity stolen from an actual person—living or dead—is more desirable than a fabricated identity, for two reasons. First, real identities provide offenders with better cover because they are based upon verifiable information (e.g., real social security numbers, dates of birth, and names). Second, stolen identities have a broader range of uses than fictitious ones—for example, one can use a real person's birth certificate to obtain an authentic passport issued by the United States Government and to freely enter and depart the U.S., whereas a doctored passport would be detected by electronic scanners. As a result, to the offender, it matters little whether the person whose identity was stolen is living or deceased, so long as the person is an actual person. *Cf. Flores-Figueroa*, 129 S. Ct. at 1892 (declining to conclude that "Congress intended to achieve [the statute's] enhanced protection by permitting conviction of those who do not *know* the ID they unlawfully use refers to a real person, *i.e.*, those who do not *intend* to cause this further harm."). In fact, it is not unlikely for Congress to have been more concerned with deterring theft of deceased

persons', as opposed to living persons', identities because the former is often less likely to be discovered. As the First Circuit noted in *Jiminez*, "A false identity created from the means of identification of the deceased may even be *superior* to one stolen from the living. The dead, after all, will not create conflicting paper trails or notice strange activity on their credit reports." 507 F.3d at 20 n.8 (emphasis in original); *see also Kowal*, 527 F.3d at 747 ("An identity stolen from a deceased person . . . is far less likely to be uncovered than one stolen from a living person.").

**[8]** We also recognize that, as a practical matter, the purpose of the statute would be frustrated if we read "person" to mean only "living persons." Doing so would make prosecution of these aggravated felonies almost impossible. A defendant in such a prosecution may simply claim he did not know the person whose identity he stole was alive. Absent some objective evidence that the defendant knew the victim personally, the government would be unable to prosecute this sort of theft. Indeed, this is the precise obstacle that would confront the government in this case were we to accept Maciel's argument. These practical considerations are markedly different from those involved in *Flores-Figueroa*. There, the Court noted that there often would be circumstantial evidence that the defendant knew that the victim was real. 129 S. Ct. at 1893. "[T]he examples of identity theft in the legislative history (dumpster diving, computer hacking, and the like)" were, as the Court observed, "all examples of the types of classic identity theft where intent should be relatively easy to prove, and there will be no practical enforcement problem" because one cannot hack a fictitious person's computer or rummage through a fictitious person's trash. *Id.* Here, however, proving the defendant subjectively knew that his victim was a living person would be a virtually impossible undertaking. Similarly, although Maciel obtained the birth certificate from the Orange County registrar, he had no idea that Ramirez was living in Arizona, and it made no difference in his use of Ramirez's birth certificate whether Ramirez was dead or

alive. Birth certificates are evidence only of a live birth—they provide no evidence as to death.

Maciel argues that Congress' primary intent was to protect the victims of identity theft, and because deceased persons cannot be victimized, Congress did not intend a broad reading of the word "person." The legislative history does indicate that one of Congress' concerns was the financial cost to consumers and the damage to victims' credit histories. *See* H.R. Rep. No. 108-528, at 4-5. Simply because the birth certificate belongs to a dead person, however, does not mean stealing it is a victimless crime. Maciel fails to appreciate the significance—legal and personal—of one's identity even after one dies; theft of these identities is not a victimless crime. The decedent's estate remains vulnerable to claims before it is closed. Identity theft can therefore endanger the decedent's legacy and bequests. Moreover, the identities of friends and family of the deceased may be more easily accessed by potential thieves. *See, e.g.*, *Lee v. Superior Court*, 989 P.2d 1277, 1279-80 (Cal. 2000) (finding that the legislature likely intended a false impersonation statute to apply to impersonation of a deceased person, "to protect a deceased person's interests during the period between death and the settling of his or her estate"). Congress' clear intent was to deter and punish identity theft, not merely to shift the adverse effects of the crime from the living to the dead and their heirs. Further, by cherry-picking from the legislative history, Maciel ignores Congress' broader concern over national security: protecting the nation from terrorists who use stolen identities to hide from law enforcement. *See, e.g.*, H.R. Rep. No. 108-528, at 4 ("As international cooperation increases to combat terrorism, al-Qaida and other terrorist organizations increasingly turn to stolen identities to hide themselves from law enforcement."). Indeed, this concern is ever present where, as here, one boards an airplane bound for the U.S. using an authentic U.S. passport obtained through unlawful means. A narrow reading of the word "person" is inconsistent with Congress' concern

over terrorist threats. We decline Maciel's invitation to under-cut Congress' intent by giving "person" a restricted reading.

## IV.

**[9]** Maciel urges that we apply the rule of lenity in light of Congress' use of the word "person." The rule of lenity "is rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited." *United States v. Nader*, 542 F.3d 713, 721 (9th Cir. 2008) (internal quotation marks omitted). The rule of lenity "applies only when there is a grievous ambiguity or uncertainty in the statute and when, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended." *United States v. Iverson*, 162 F.3d 1015, 1025 (9th Cir. 1998) (internal quotation marks omitted); *see also Nader*, 542 F.3d at 721 ("The rule of lenity applies only where after seizing every thing from which aid can be derived, the Court is left with an ambiguous statute. The language of the statute must be grievously ambiguous." (citation and internal quotation marks omitted)).

**[10]** Section 1028A(a)(1) is not ambiguous. That "person" is used variously to refer both to living and deceased persons demonstrates that Congress may have intended that the phrase "another person" encompass both; and when read in its proper context and with a view to its place in the overall statutory scheme, it is clear that Congress did intend that it encompass both. The legislative history of § 1028A and practical considerations confirm this reading. Maciel's conduct unambiguously falls within the provisions of § 1028A(a)(1), rendering application of the rule of lenity unwarranted.

## CONCLUSION

**[11]** Because we conclude that the government was not required to prove that Maciel knew that Ramirez was a living

person when he committed the crime of aggravated identity theft, the judgment of conviction for violating § 1028A(a)(1) is **AFFIRMED**.