[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-11673

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 21, 2012
JOHN LEY
CLERK

D.C. Docket No. 4:10-cr-00079-SPM-WCS-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

GRACIELA ZUNIGA-ARTEAGA,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(May 21, 2012)

Before CARNES, MARTIN, and JORDAN, Circuit Judges.

MARTIN, Circuit Judge:

Graciela Zuniga-Arteaga appeals her conviction for aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). On appeal, Ms. Zuniga-Arteaga argues that § 1028A(a)(1) cannot be applied to her conduct because that provision

does not cover the theft of a person's identity when that person is no longer living. After careful review of the briefs, and with the benefit of oral argument, we affirm.

## I. FACTUAL BACKGROUND[1]

Ms. Zuniga-Arteaga, a Mexican national, sought admission to the United States in March 1995. She first claimed to have been born in Texas, but offered no documents supporting her claim. When authorities learned that the name and birthday given by Ms. Zuniga-Arteaga did not exist, she signed an I-275 Notice of Visa Cancellation Form and returned to Mexico.

At some point, Ms. Zuniga-Arteaga returned to the United States, where she was later arrested for an alleged drug offense. When arrested, she said that her name was "MSG," and gave a false identification document in the form of a Texas Department of Public Safety Identity Card in the name "MSG."[2] At her initial appearance, however, Ms. Zuniga-Arteaga admitted that she was the person named in the indictment, "Zuniga-Arteaga." In August 2002, Ms. Zuniga-Arteaga was convicted in federal court for conspiracy to possess with intent to distribute more than 1,000 kilograms of marijuana.

Nearly eight years later, on February 18, 2010, Immigration and Customs

---

[1] This account comes from the parties' Stipulation of Facts.

[2] The record refers only to her initials.

2

Enforcement (ICE) encountered Ms. Zuniga-Arteaga at the federal prison in Tallahassee, Florida, where she was serving her sentence for the 2002 conviction. During that meeting, Ms. Zuniga-Arteaga claimed to be "MSG," a United States citizen born in Mercedes, Texas. Ms. Zuniga-Arteaga also gave ICE a date of birth that has since been confirmed to belong to MSG, who had lived and died prior to Ms. Zuniga-Arteaga's use of the name.

On July 27, 2010, Ms. Zuniga-Arteaga again told an ICE agent that her name was "MSG," and that she was born in Mercedes, Texas. She also again gave as her date of birth that of MSG. In response, the ICE agent showed her the I-275 form, which she had signed in 1995. She admitted to having signed the form and asked to speak to an attorney.

In another interview with ICE on August 3, 2010, Ms. Zuniga-Arteaga again said her name was "MSG," and that she was a U.S. citizen born in Mercedes, Texas. She also said she had contacted her attorney and that he was in the process of securing her birth certificate. On September 21, 2010, Ms. Zuniga-Arteaga's attorney presented a valid birth certificate for MSG to ICE.

Meanwhile, law enforcement investigated further and found that Ms. Zuniga-Arteaga was not MSG. They located and interviewed MSG's brother, who told them that MSG was a U.S. citizen who died as a child in 1960. Law

3

enforcement also acquired a certified copy of MSG's death certificate confirming the brother's statements. The information on the death certificate matched that repeatedly given by Ms. Zuniga-Arteaga, and shown on the birth certificate produced by her attorney.

On October 1, 2010, during an interview with ICE, Ms. Zuniga-Arteaga signed a sworn statement that the birth certificate with the name "MSG" was hers, and that she was a U.S. citizen.

## II. PROCEDURAL HISTORY

On November 2, 2010, Ms. Zuniga-Arteaga was indicted for falsely representing herself to be a citizen of the United States in violation of 18 U.S.C. § 911, as well as for possessing and using a means of identification of another person during and in relation to the § 911 offense (that is, committing "aggravated identity theft") in violation of 18 U.S.C. § 1028A(a)(1).

In December 2010, Ms. Zuniga-Arteaga waived a jury trial. She also filed a Motion for Judgment of Acquittal under Federal Rule of Criminal Procedure 29, arguing that § 1028A(a)(1) does not apply because MSG is deceased. The government filed two memoranda opposing that argument.

The bench trial was conducted on December 20, 2010. Nine days later, the district court filed its Bench Trial Verdict and Order Denying Motion for

Judgment of Acquittal, concluding that § 1028A(a)(1) applies to the identities of the dead, and convicting Ms. Zuniga-Arteaga on both counts of the indictment.

On March 21, 2010, the district court sentenced Ms. Zuniga-Arteaga to thirty-three months imprisonment, twenty-four months of which is for the § 1028A conviction. This appeal followed.

## III. STANDARD OF REVIEW

We review the denial of a Rule 29 motion for judgment of acquittal de novo. See United States v. Gamory, 635 F.3d 480, 497 (11th Cir. 2011). We also "review issues of statutory interpretation de novo." United States v. Mazarky, 499 F.3d 1246, 1248 (11th Cir. 2007).

## IV. DISCUSSION

Section 1028A(a)(1) states:

In general.—Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

18 U.S.C. § 1028A(a)(1) (emphasis added). Ms. Zuniga-Arteaga argues that the term "person" in the statute refers only to the living, and does not cover theft of the identity of a person who has died. Thus, she argues that her use of MSG's identity falls outside the statute's scope. Though this issue is one of first

impression for this Court, we now follow four circuits in holding that § 1028A(a)(1) punishes theft of the identity of any actual person, regardless of whether that person is still alive. See United States v. LaFaive, 618 F.3d 613, 617–18 (7th Cir. 2010); United States v. Maciel-Alcala, 612 F.3d 1092, 1100 (9th Cir. 2010); United States v. Kowal, 527 F.3d 741, 746–47 (8th Cir. 2008); United States v. Jimenez, 507 F.3d 13, 22 (1st Cir. 2007).

## A.

When interpreting a statute, the "starting point . . . is the language of the statute itself." Randall v. Loftsgaarden, 478 U.S. 647, 656, 106 S. Ct. 3143, 3149 (1986). In conducting this interpretation, we analyze the language of the provision at issue, the specific context in which that language is used, and the broader context of the statute as a whole. Warshauer v. Solis, 577 F.3d 1330, 1335 (11th Cir. 2009). If this analysis reveals that the provision "has a plain and unambiguous meaning with regard to the particular dispute in the case and the statutory scheme is coherent and consistent," then our inquiry is complete. Id. (quotation marks omitted).

However, where an ambiguity in the language of the statute cannot be resolved by examination of the "text actually approved by Congress and made a part of our country's laws," CBS Inc. v. Primetime 24 Joint Venture, 245 F.3d

6

1217, 1225 (11th Cir. 2001), then we look to the legislative history for additional guidance as to Congress's intent. See Picard v. Credit Solutions, Inc., 564 F.3d 1249, 1253 (11th Cir. 2009); see also Lowery v. Ala. Power Co., 483 F.3d 1184, 1205 (11th Cir. 2007) ("When ambiguity in a statute renders congressional intent unclear, and that lack of clarity can not be resolved through the sort of intrinsic aids we have employed here, it is appropriate to resort to extrinsic aids such as legislative history."). If two reasonable readings of the provision remain after this analysis, then the rule of lenity counsels us to choose the less harsh reading. United States v. Sloan, 97 F.3d 1378, 1382 (11th Cir. 1996).

B.

We begin our analysis by looking to the statute's plain language. See Randall, 478 U.S. at 656, 106 S. Ct. at 3149. Because Congress did not define the term "person," see 18 U.S.C. § 1028(d) (defining other terms in § 1028A, but not the term "person"), we look to its ordinary meaning, see United States v. Frank, 599 F.3d 1221, 1234 (11th Cir. 2010). The definitions of "person" contained in standard general-purpose dictionaries reflect ambiguity in the common usage of that term. See LaFaive, 618 F.3d at 616 ("[S]ome definitions limit a 'person' to a living being, while other definitions are not so limiting."); see also Maciel-Alcala, 612 F.3d at 1096 (collecting definitions of "person"); Kowal, 527 F.3d at 746

7

(same); Jimenez, 507 F.3d at 19 (same). And though some terms that carry ambiguity in popular parlance may possess a specific meaning as a legal term of art, see, e.g., F.A.A. v. Cooper, ___ U.S. ___, ___, 132 S. Ct. 1441, 1449 (2012), "person" has no definitive legal meaning. See Maciel-Alcala, 612 F.3d at 1096–98 (reviewing legal dictionaries and state and federal statutory usage but concluding that these sources do not clarify the ambiguity). Thus, to determine the meaning of the term "person" here, we must consider the context in which it is used. See Jimenez, 507 F.3d at 19.

We consider the provision as a whole "to determine whether the context gives the term a further meaning that would resolve the issue in dispute." Robinson v. Shell Oil Co., 519 U.S. 337, 343–44, 117 S. Ct. 843, 847 (1997). In particular, we examine the phrase "a means of identification of another person," 18 U.S.C. § 1028A(a)(1), for indications as to whether Congress intended this provision to apply only to the living. Congress defined the term "means of identification" to encompass "any name or number that may be used . . . to identify a specific individual." 18 U.S.C. § 1028(d)(7). Thus Congress did not limit that term to the identification of individuals still living. Absent any indication to the contrary, Congress's use of the term "specific individual" in a way that captures both the living and the dead suggests that Congress did not intend to limit the

8

provision. Insofar as the term "means of identification" may also include the identification of the living and dead, it seems natural to read "a means of identification of another person" as simply "a means of identification of anyone other than the defendant." See Merriam-Webster's Collegiate Dictionary 48 (10th ed. 2000) (defining "another" as "different or distinct from the one first considered"); cf. LaFaive, 618 F.3d at 616–17 (holding that "person" includes both living and dead "[b]ecause there is nothing in § 1028A(a)(1) that would naturally limit" the term to the living).

With that indication of the term's meaning, we turn to "[t]he broader context provided by other sections of the statute" for further guidance. Robinson, 519 U.S. at 345, 117 S. Ct. at 848. We observe that § 1028A uses the precise phrase—"means of identification of another person"—twice, and in close proximity. In addition to its use in § 1028A(a)(1), the phrase appears in the neighboring provision, 18 U.S.C. § 1028A(a)(2). Section 1028A(a)(2) provides additional punishment for anyone who "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person or a false identification document" as part of committing a terrorism offense. 18 U.S.C. § 1028A(a)(2). Due to the proximity of these two uses of the same phrase, we draw the inference that Congress intended to give the phrase the same meaning in

both provisions.  See Comm'r v. Lundy, 516 U.S. 235, 250, 116 S. Ct. 647, 655 (1996); see also LaFaive, 618 F.3d at 617 (employing this approach); Maciel-Alcala, 612 F.3d at 1098 (same); Kowal, 527 F.3d at 746–47 (same); Jimenez, 507 F.3d at 19 (same).

In conducting our review of this parallel provision, we note that § 1028A(a)(2) punishes two types of conduct, relating either to "a means of identification of another person or a false identification document."  18 U.S.C. § 1028A(a)(2) (emphasis added).  Congress defined the latter to encompass conduct relating to all fraudulent documents, tying the documents to the identification of "individuals" without drawing any distinction based on whether those documents pertained to the living or the dead.  See 18 U.S.C. § 1028(d)(4).[3] Thus, both phrases surrounding the term "person" in § 1028A(a)(2)—"a means of identification" on one side, and "a false identification document" on the other—employ "individual," a close synonym of the term "person," in a way that draws no distinction between the living and the dead.  This, combined with the absence of any indication of intent to narrow § 1028A(a)(2), adds to the inference

---

[3] Congress defined a "false identification document" as "a document of a type intended or commonly accepted for the purposes of identification of individuals" that "appears to be issued by or under" legitimate governmental authority, but in fact was either not issued "by or under the authority of a governmental entity" or was "altered for purposes of deceit" after being issued by the government.  18 U.S.C. § 1028(d)(4).

10

that Congress intended the term "person" in § 1028A to include both living and dead individuals.

The statute's purpose supports this interpretation of § 1028A(a)(1). As the Ninth Circuit observed, like the theft of living persons' identities, "theft of [deceased persons'] identities is not a victimless crime." Maciel-Alcala, 612 F.3d at 1101. Instead, it has very real consequences for the living, such as the beneficiaries of the decedents and businesses who are misled into relying on the stolen identity information. See id. at 1100–02. Congress made clear that these risks, as much as concern for the living victims of identity theft, motivated this legislation. See H.R. Rep. No. 108-528, at 4 (2004) (noting that, in addition to the security risks posed by identity theft, "the cost to the consumer and corporations is equally alarming," causing tens of billions of dollars of losses to businesses and financial institutions).

Congress also likely recognized that this form of identity theft warranted additional deterrence. "A false identity built on the bedrock foundation of real means of identification . . . provides better cover for the wrongdoer than would one based on wholly fabricated identities" because the former are based on verifiable information. Jimenez, 507 F.3d at 20; see Maciel-Alcala, 612 F.3d at 1100. Further, stolen identities of real people "have a broader range of uses than

11

fictitious ones—for example, one can use a real person's birth certificate to obtain an authentic passport issued by the United States Government and to freely enter and depart the U.S., whereas a doctored passport would be detected by electronic scanners." Maciel-Alcala, 612 F.3d at 1100–01.

These concerns apply with equal force when the real person whose identity is stolen is dead. Indeed, there is good reason to think that Congress would have regarded this form of identity theft as particularly worrisome. "The dead, after all, will not create conflicting paper trails or notice strange activity on their credit reports." Jimenez, 507 F.3d at 20 n.8. In light of the considerable harm caused by this conduct, and the apparent need for deterrence, Congress almost certainly intended for § 1028A(a)(1) to apply to those who steal the identity of any real person, regardless of whether the person is still living.

Viewed together, the text, structure and purpose of the statute make plain the meaning of § 1028A(a)(1)'s text: the provision criminalizes the use of a real person's identity, regardless of whether that person is currently living.

C.

Ms. Zuniga-Arteaga raises a host of arguments to counter this conclusion. First, Ms. Zuniga-Arteaga offers a structural argument based on an alternative interpretation of § 1028A(a)(2). She urges that the statute's prohibition on the use

12

of "the means of identification of another person" be read to refer to the use of a living person's identity information, while the provision's proscription on using "false identification documents" be read to encompass the use of counterfeit identity documents, "regardless of whether the identification document relates to a person who is living, dead, real, or fictitious." Based on that reading of § 1028A(a)(2), Ms. Zuniga-Arteaga asserts that the phrase "means of identification of another person" in § 1028A(a)(1) must also only apply to the use of identity information of living persons. But this line of argument begs the question, assuming a favorable meaning of "person" in § 1028A(a)(2) and then applying that meaning in § 1028A(a)(1).

Beyond this, by leaving a gap in § 1028A(a)(2) that would not punish an individual who uses only a deceased person's personal information, this interpretation would run directly counter to "Congress'[s] broader concern over national security: protecting the nation from terrorists who use stolen identities to hide from law enforcement." Maciel-Alcala, 612 F.3d at 1102; see LaFaive, 618 F.3d at 617 (rejecting the proposed interpretation as inconsistent with the "broad coverage" intended by Congress). For both reasons, we are not persuaded by her structural argument.

Second, Ms. Zuniga-Arteaga points out that, in Flores-Figueroa v. United

<u>States</u>, 556 U.S. 646, 129 S. Ct. 1886 (2009), the Supreme Court construed § 1028A narrowly. But that observation about <u>Flores-Figueroa</u> is incomplete. In that case, the Supreme Court held that the government must prove that a defendant knew that the identity she appropriated belonged to a real person, <u>Flores-Figueroa</u>, 556 U.S. at 657, 129 S. Ct. at 1894, and the disposition rested largely on "the ordinary meaning . . . of the words" written by Congress, <u>id.</u> The Supreme Court reached a narrow result, based upon the statute's express requirement that the violator acted "knowingly." <u>See</u> <u>id.</u> Given that the plain text of the statute does not similarly answer the specific question before us here, Ms. Zuniga-Arteaga's argument does not sway us.

Third, Ms. Zuniga-Arteaga makes an argument based on § 1028A(a)(1)'s purpose as well. She points out that in <u>Flores-Figueroa</u>, the Supreme Court seemed to accept the idea that one purpose of § 1028A is to provide "enhanced protection for individuals whose identifying information is used to facilitate the commission of crimes." 556 U.S. at 654, 129 S. Ct. at 1892 (quotation marks omitted). We recognize that applying § 1028A(a)(1) to the deceased does not quite fit that purpose, since presumably it is not the deceased "individuals whose identifying information is used" that would benefit from protection in these cases. But acknowledging that the statute has one purpose does not preclude the

14

possibility that it has others as well. As a result, we are not persuaded by this argument either.

Fourth, having settled on an interpretation of the statute, we can also reject Ms. Zuniga-Arteaga's rule of lenity argument. See Holloway v. United States, 526 U.S. 1, 12 n.14, 119 S. Ct. 966, 972 n.14 (1999) ("We have repeatedly stated that the rule of lenity applies only if, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended." (quotation marks and alterations omitted)).

Ultimately, Ms. Zuniga-Arteaga offers no basis for believing that her proposed interpretation better reflects Congress's intent than the alternative adopted by four other circuits. If anything, her arguments confirm the relative strength of the interpretation of § 1028A(a)(1) that we adopt today.

IV.

For these reasons, we affirm Ms. Zuniga-Arteaga's conviction.

**AFFIRMED.**