**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

CLINTON ELWYN THOMPSON, III,
AKA Darion Jones, AKA Calvin
Leon Thompson, AKA Clinton
Edwin Thompson, AKA Clinton
Elway Thompson, AKA Clinton
Elwin Thompson, III,
*Defendant-Appellant*.

No. 10-50381

D.C. No.
2:10-cr-00304-
JFW-1

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

TAVRION DAWSON,
*Defendant-Appellant*.

No. 10-50479

D.C. No.
2:10-cr-00304-
JFW-2

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee*,

                    v.

SAMUEL ANTHONY EATON, AKA
Samuel Eaton,
          *Defendant-Appellant*.

No. 11-50081

D.C. No.
2:10-cr-00304-
JFW-3

OPINION

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted
April 8, 2013—Pasadena, California

Filed August 29, 2013

Before: Stephen Reinhardt and Mary H. Murguia, Circuit
Judges, and Donald W. Molloy, District Judge.[*]

Opinion by Judge Reinhardt;
Dissent by Judge Murguia

---

 [*] The Honorable Donald W. Molloy, District Judge for the U.S. District
Court for the District of Montana, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel reversed convictions under 18 U.S.C. § 844(h)(1) and the corresponding conspiracy counts under § 844(m), vacated the sentences on remaining counts of bank larceny, and remanded to the district court for resentencing in a case in which the defendants used a thermal lance – a tool designed to cut through metal using extreme heat – to cut open the back of an ATM in order to steal the money it contained.

The panel held that the penalty enhancement for "us[ing] fire" to commit a felony under § 844(h)(1) does not apply to the use of a thermal lance tool.

Dissenting, Judge Murguia wrote that the majority's holding is counter to the ordinary and common definition of fire.

### COUNSEL

Mark Yanis (argued), Huntington Beach, California, for Defendant-Appellant Clinton Thompson, III.

Gretchen Fusilier (argued), Carlsbad, California, for Defendant-Appellant Tavrion Dawson.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Sean K. Kennedy, Federal Public Defender; Samuel A. Josephs (argued), Deputy Federal Public Defender, Federal Public Defenders' Office, Los Angeles, California, for Defendant-Appellant Samuel Eaton.

André Birotte Jr., United States Attorney; Robert E. Dugdale, Assistant United States Attorney, Chief, Criminal Division; Justin R. Rhodes (argued) and Lana Morton-Owens, Assistant United States Attorneys, Violent & Organized Crimes Section, United States Attorney's Office, Los Angeles, California, for Plaintiff-Appellee.

**OPINION**

REINHARDT, Circuit Judge:

This case involves a penalty enhancement statute, 18 U.S.C. § 844(h)(1), which imposes a mandatory ten-year consecutive sentence (in addition to the sentence for the underlying felony) on anyone who "uses fire . . . to commit any felony." The enhancement is increased to twenty mandatory consecutive years for a second offense.[1] § 844(h). Defendants Clinton Thompson, Tavrion Dawson, and Samuel Eaton were convicted of bank larceny, and their sentences were enhanced because they were convicted of using a thermal lance—a tool designed to cut through metal using extreme heat. The defendants used the tool to cut open the back of an ATM in order to steal the money it contained. We must now decide whether the penalty enhancement for "us[ing] fire" to commit a felony under 18 U.S.C. § 844(h)(1)

---

[1] Defendant Samuel Eaton was convicted of two separate incidents and, as a result, received a thirty-year enhancement.

is applicable to the use of a thermal lance tool. We conclude that it is not. As a result, we reverse defendants' convictions under § 844(h)(1) and the corresponding conspiracy counts under § 844(m); we vacate the sentences on the remaining counts of bank larceny; and we remand to the district court for resentencing on the remaining counts of bank larceny.[2]

## FACTS

Samuel Eaton masterminded a plan to rob the Los Angeles Federal Credit Union ATM in El Monte, California, using a thermal lance to cut open the back of the ATM. He enlisted the help of Christopher Williams,[3] Clinton Thompson, III, and Tavrion Dawson. On the evening of January 28, 2008,[4] Eaton dropped Williams off at the Los Angeles Federal Credit Union, where Williams broke into the ATM room through an adjacent abandoned store, using a crowbar to smash a hole through the drywall. Once inside, he triggered the alarm and disabled the camera. Williams then

---

[2] Thompson and Dawson raise additional arguments on appeal that relate to the bank larceny counts. We reject these arguments in a memorandum disposition filed concurrently with this opinion. Because Eaton does not challenge his convictions for bank larceny, we do not address them. Thus, all of the bank larceny convictions stand, and we remand to the district court for resentencing on the bank larceny counts alone.

[3] Williams agreed to testify against his co-conspirators as a condition of his plea agreement.

[4] About a week later, on February 5, 2008, Eaton and Williams committed another bank larceny using the thermal lance at a Bank of America ATM in Duarte, California. Thompson and Dawson were not charged with the second bank larceny, but otherwise the facts were analogous. Because the facts of the second bank larceny are analogous, we do not mention them here.

met Eaton at his car, where they waited to see if the police would respond. The bank manager and police arrived at the scene, but, seeing no signs of criminal activity from the outside, they left. Eaton and Williams then met Thompson and Dawson at a nearby Denny's Restaurant to hand off the tools—Thompson brought the thermal lance and Dawson brought a hammer.[5]

After several hours had passed, Eaton and Williams went back to the Los Angeles Federal Credit Union and reentered the ATM room with the thermal lance. Eaton and Williams assembled the thermal lance and Eaton operated it to cut open the ATM by melting through the metal vault. At the same time, Williams sprayed water from a five-gallon water cannister into the ATM to prevent the money inside from catching fire. Once the ATM was open, the two men gathered the money into a black duffel bag and left the bank. They stole approximately $79,000.

The tool that Eaton and Williams used to cut open the ATM—a thermal lance—is a cutting tool designed to cut, pierce, and gouge metal. The component parts are a "pistol grip" (similar to the nozzle on a garden hose), a "cutting rod," an oxygen tank, a battery, and a striker plate. The pistol grip operates the thermal lance tool by regulating the flow of pressurized oxygen from the tank through the cutting rod, which is a hollow steel alloy pipe containing several wire rods of magnesium or aluminum metal. One end of the pistol grip connects to the cutting rod. The other end of the pistol

---

[5] Thompson and Dawson were not with Eaton at the time of the crime. As a result, Thompson and Dawson were charged and convicted under conspiracy and aiding and abetting theories of liability for their involvement.

grip connects to the oxygen tank and, separately, to one side of a 12-volt battery, similar to a car battery. The other side of the battery connects to a metal striker plate.

Once everything is assembled, the operator "lightly squeeze[s] the oxygen control lever" on the pistol grip to start the flow of oxygen and "slowly pull[s] the rod across the striker plate" to create a spark. This spark ignites the oxygen, causing the tip of the cutting rod to change state from a solid to a liquid form, and in the process the lance can be used to cut various metals by touching the cutting rod to the metal surface. The thermal lance emits other sparks, or a "flickering flame" as it operates. It cuts the metal by melting through it with the extreme heat—up to 10,000 degrees Fahrenheit—created at the tip of the lance. To stop cutting, the operator need only release the oxygen lever of the pistol grip, ceasing the flow of pressurized oxygen. Releasing the pistol grip also stops the sparks or "flickering flame."

The most common uses of the tool, as established by the instructional video shown to the jury, are on construction sites to cut or pierce metal. Notably, the thermal lance can be used to cut metal underwater. Although it emits a byproduct of sparks and a "flickering flame" as it operates, the extreme heat expelled by the pressurized oxygen actually cuts through the metal. The sparks and "flickering flame" are only incidental to the purpose of the tool, which is to melt through metal using extreme heat. The risk of fire that accompanies the use of the thermal lance is that the sparks or "flickering flame" given off by the extreme heat generated at the tip of the cutting rod may accidentally catch something nearby on fire. As the manual notes: "[s]parks, splatter and molten material generated by [using the thermal lance] can cause fire."

Eaton and Williams took steps that successfully avoided any risk of a fire.  Williams continuously sprayed the ATM with water from a five-gallon water cannister while Eaton was operating the thermal lance.  Their use of the thermal lance, nonetheless, left traces of the extreme heat used.  The photographs and testimony revealed a few burned bills from the ATM, "tile on the ground [that] was burned," "walls [that] were a little bit shaded" with soot, and a smell of smoke in the room, described by one investigating officer as an "industrial burning type smell, like plastic, or steel."

The efforts Eaton and Williams took to avoid fire were also apparent from the evidence.  The testimony and photos revealed that the floor surrounding the ATM vault was covered in water.  Detective Black testified that there were "water rings that were still moist on the floor immediately next to the safe."  Eaton concentrated his use of the thermal lance on the ATM vault, and, as a result, it did not cause any structural damage to the buildings.  No fire alarms went off, and the fire department was never called.

## PROCEDURAL BACKGROUND

This appeal involves three defendants: Thompson, Dawson, and Eaton.  Thompson and Dawson were charged and tried jointly for their involvement as aiders and abettors as well as conspirators in the events surrounding the bank larceny at the Los Angeles Federal Credit Union on January 28, 2008.  Eaton was tried separately.  He faced additional counts for committing a bank larceny at the Bank of America on February 5, 2008.  Before trial, each of the defendants sought to have the "uses fire" charges dismissed because, they argued, as a matter of statutory interpretation, § 844(h)(1) does not apply to the use of a thermal lance tool.

The district court denied the motions, explaining that the statutory language is "clear and unambiguous." Defendants renewed their motions to dismiss as motions for acquittal, which the district court again denied. After jury trials, defendants were convicted on all counts. At sentencing, the court applied the "uses fire" penalty enhancement, 18 U.S.C. § 844(h)(1), to the defendants' sentences. Defendants timely appeal. We have jurisdiction under 28 U.S.C. § 1291.

## DISCUSSION

This appeal raises a question of statutory interpretation that we review de novo.[6] *United States v. Youssef*, 547 F.3d 1090, 1093 (9th Cir. 2008) (citation omitted). We must interpret the penalty enhancement under § 844(h)(1) and

---

[6] Before trial, each of defendants sought to have the "uses fire" charges dismissed as a matter of statutory interpretation on the ground that § 844(h)(1) does not apply to the use of a thermal lance tool. The district court denied the motions, rejecting defendants' statutory interpretation argument as a matter of law, but permitting defendants to move for acquittal at the close of evidence. Defendants moved for acquittal, which the district court again denied. Thus, although the government attempts to characterize defendants' appeal as one challenging the sufficiency of the evidence, the question raised is clearly one of statutory interpretation that we review de novo. *United States v. Graham*, 691 F.3d 153, 156 n.3 (2d Cir. 2012), *vacated on other grounds*, 133 S. Ct. 2851 (June 24, 2013) (No. 12-7274) (deciding a question of statutory interpretation of § 844(h)(1) and, thus, "not address[ing the argument] . . . that the evidence presented at trial was insufficient to convict"); *see also United States v. Wright*, 625 F.3d 583, 590 (9th Cir. 2010) (reviewing "de novo" a "challenge to the sufficiency of the evidence, including questions of statutory interpretation") (internal citations omitted).

determine whether the statutory language "uses fire" includes defendants' use of the thermal lance tool.[7]

Because "uses fire" is not otherwise defined in the statute, we first ask whether the "ordinary, contemporary, [and] common meaning" of the language answers the question before us—that is, whether it includes defendants' use of a thermal lance. *See United States v. Maciel-Alcala*, 612 F.3d 1092, 1096 (9th Cir. 2010). If the language is ambiguous or is capable of more than one reasonable interpretation, we "consult the legislative history, to the extent that it is of value, to aid in our interpretation." *Merkel v. Comm'r of Internal Revenue*, 192 F.3d 844, 848 (9th Cir. 1999). The statute's "purpose" also guides our analysis. *See Jonah R. v. Carmona*, 446 F.3d 1000, 1005, 1010–11 (9th Cir. 2006). These canons of construction "are not mandatory rules" but rather guides "designed to help judges determine the Legislature's intent as embodied in particular statutory language," and "other circumstances evidencing congressional intent can overcome their force." *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001). The Second

---

[7] 18 U.S.C. § 844(h) provides:

Whoever—

(1) uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States, . . .

in addition to the punishment provided for such felony, [such person shall] be sentenced to imprisonment for 10 years [to run consecutively]. In the case of a second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for 20 years [to run consecutively].

Circuit has interpreted a closely associated word in the same statute, and we reach the same result applying a similar analysis. *United States v. Graham*, 691 F.3d 153, 156 (2d Cir. 2012), *vacated on other grounds*, 133 S. Ct. 2851 (June 24, 2013) ( No. 12-7274).

# I.

The "ordinary, contemporary, [and] common meaning" of "uses fire" does not include using a tool like the thermal lance because we ordinarily understand "fire" to refer to flames that burn in a sustained manner. *Maciel-Alcala*, 612 F.3d at 1096.

First, the common meaning of "uses fire" does not include burning by heat. It is common sense that heat can cause burning-type damage, without any actual fire being involved. For example, a hot iron left on a shirt for too long will leave the shirt badly burned. That the up to 10,000 degrees Fahrenheit heat generated by the thermal lance tool results in burning-type damage does not suggest that fire, rather than extreme heat, caused this damage.[8] The thermal lance instructional manual makes clear that the thermal lance uses heat and not fire to cut through the metal.[9] The manual

---

[8] In this case, for example, the area surrounding the ATM, included singed bills, some burnt tiles, soot on the walls, and the smell of smoke. Although each of these is a burning-type damage that could also have been caused by fire, here, the damage was caused by the extreme heat generated by the thermal lance tool as it cuts through the metal surface.

[9] The thermal lance can be used underwater. Fire would not sustain if submerged in water.

makes no mention of fire, except to warn of the *risk* that fire may result from the "[s]parks, splatter and molten material generated by [the] process" of using the thermal lance.

Second, although a byproduct of operating the thermal lance is that the tool emits "sparks," or a "flickering flame," neither constitutes "fire" in the common meaning of the word. The sparks are merely particles of the melting metal given off by the thermal lance. At Eaton's trial, Detective Black described these sparks as a "flickering flame." Whatever the label, our ordinary understanding of "fire" is that it involves sustained burning of flames, not just particle-like sparks, given off by the tool, or a "flickering flame" that is not sustained burning and ceases whenever the operator of the tool releases the pistol grip or other mechanism.

Third, even if sparks or a "flickering flame" did constitute "fire," they were not "use[d] . . . to commit a[] felony," but rather were merely incidental to the use of the thermal lance. § 844(h)(1). To "use" means to "actively employ." *See Bailey v. United States*, 516 U.S. 137, 143 (1995) (defining "use" as "active employment"), *superseded by statute*, Act of Nov. 13, 1998, Pub. L. No. 105-386, 112 Stat. 3469. Operation of a thermal lance actively employs, or uses, extreme heat and pressurized oxygen to penetrate metal. The metal being cut never catches fire. The sparks and "flickering flame" are merely a byproduct of the operation of the tool. The tool's function is to use extreme heat—not fire—to cut through metal. Moreover, even if a "mini-fire" could be said to result from the sparks or "flickering flame," this does not serve the purpose of using the tool because it does not aid in cutting the metal in any fashion. Quite the contrary, the

successful use of a thermal lance involves careful avoidance of the risk of fire.  For example, here, defendants assiduously avoided starting a fire by spraying the ATM with water the entire time that they operated the thermal lance tool.

Thus, we conclude that use of a thermal lance tool—designed to cut through metal using extreme heat, not fire—does not fall within the "ordinary, contemporary, [and] common meaning" of "uses fire." *Maciel-Alcala*, 612 F.3d at 1096; § 844(h)(1).

## II.

The dissent reaches a different conclusion by adopting the government's definition of "fire" as the "chemical process of combustion involving heat, light and a combination of smoke and flame."  According to the dissent, because a chemical combustion occurs at the tip of the thermal lance that involves heat, light, and a combination of smoke and a "flickering flame," the defendant uses "fire" within the meaning of § 844(h)(1).  Not only does the dissent's definition of "fire" fail to comport with the ordinary meaning of that term but the dissent fails to comprehend that, as explained earlier, the defendant "uses" not fire, but a thermal lance, to commit the felony in question.  Moreover, the dissent's approach to the statutory interpretation of § 844(h)(1) was squarely rejected by the Second Circuit in *United States v. Graham*, 691 F.3d 153 (2d Cir. 2012).[10]

---

[10] The Supreme Court granted certiorari, vacated the judgment, and remanded on grounds not related to the interpretation of § 844(h)(1). *Graham v. United States*, 133 S. Ct. 2851 (June 24, 2013) ( No. 12-7274). We find the Second Circuit's reasoning persuasive.

In *Graham*, the Second Circuit resolved a similar dispute over a similar term in the same sentence of § 844(h)(1). Graham was convicted for "us[ing] fire or an explosive to commit any felony" because he shot a gun at the ground to commit extortion. *Graham*, 691 F.3d at 155. On appeal, Graham argued that, as a matter of statutory interpretation, Congress did not intend "uses . . . an explosive" within the meaning of § 844(h)(1) to apply to shooting a gun. *Id.* at 155. The Second Circuit agreed.

The Second Circuit looked to the "ordinary or natural meaning of the words chosen by Congress, as well as the placement and purpose of those words in the statutory scheme." *Id.* at 159 (quoting *United States v. Aguilar*, 585 F.3d 652, 657 (2d Cir. 2009)). It reasoned that "[i]n ordinary usage . . . a person carrying a single unspent pistol cartridge . . . is hardly deemed by virtue of this to be armed with gunpowder or an explosive." *Id.* at 161. Also relevant to its analysis was that, in the context of the statute's definition of "explosive," it listed other serious explosives including those "used in detonation, a particularly fierce and explosive chemical reaction." *Id.* at 161 (citation and internal quotation marks omitted). It explained that "words and people are known by their companions," *id.* at 161 (quoting *Gutierrez v. Ada*, 528 U.S. 250, 255 (2000)), and, thus, the serious and substantial nature of the other explosives listed suggests that the tiny amount of gunpowder used to fire a gun does not constitute "an explosive" within the meaning of § 844(h)(1), *id.* at 160–61. The court concluded:

> We do not think Congress intended this result, nor do we think the Government's interpretation of § 844(j) [which defines "explosive" for purposes of § 844(h)(1)]—

that a single 9-millimeter cartridge falls within its definition of explosive, simply because the cartridge contains a small quantity of gunpowder—is reasonable.

*Id.* at 161.

The same reasoning applies here to the word "fire." In the statute, "fire" is a companion to the word "explosive." To put it in the Second Circuit's terms, "[i]n ordinary usage" someone who uses the thermal lance tool to commit a bank larceny by melting through the metal backing to the ATM is "hardly deemed by virtue of this to be [using fire]." *Id*. at 161. Furthermore, the statutory context, in which § 844(h)(1) places "fire" directly next to "an explosive" suggests that Congress intended the words to be interpreted in the same manner. *Gutierrez*, 528 U.S. at 254–58. Because the statute defines "explosive" as referring to those more serious and substantial uses of explosives as described in *Graham*, and not "mini-explosions," we think it also intends "fire" to refer to a more substantial occurrence than the incidental emission of sparks or a "flickering flame," which could at most be described as a "mini-fire" at the tip of the thermal lance. 691 F.3d at 161. We reach the same conclusion with respect to "fire" that the Second Circuit reached with respect to "explosive" when construing the meaning of § 844(h)(1) in accordance with the "ordinary usage" of the term at issue. *Id.* Like the Second Circuit, we reject the definition proposed by the government.

## III.

The government's proposed statutory construction "sweep[s] within the ambit of the statute a wide range of

conduct that cannot reasonably be characterized as [using fire]."[11] *United States v. Cabaccang*, 332 F.3d 622, 631 (9th Cir. 2003) (citations omitted). Such an overly broad interpretation also violates the precept that "[w]henever possible, 'we interpret statutes so as to preclude absurd results.'" *Id.* at 631 (citations omitted); *see also Arizona St. Bd. for Charter Schs. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006) ("[S]tatutory interpretations which would produce absurd results are to be avoided.") (internal quotation marks omitted).

At oral argument, government's counsel urged us to accept his contention that the "prototypical example of fire" is a "wooden match stick." Oral Argument at 27:58, *United States v. Thompson*, et al., (No. 10-50381+). Overlooking this prototypical analytical error,[12] if using a match

---

[11] The dissent's interpretation suffers from the same flaw. The only answer given to the obvious overinclusiveness of its interpretation is that "[t]he task of deciding whether a case involves potential violations of [a statute] falls upon the federal prosecutor . . . ." Dissent at 35. This is true as far as the decision to prosecute, but the ultimate task of statutory interpretation is for the judiciary and not the prosecutor. After all, "prosecutorial discretion is not a reason for courts to give improbable breadth to criminal statutes." *Abuelhawa v. United States*, 556 U.S. 816, 823 n.3 (2009). Judges (and juries), not prosecutors, decide whether a defendant is guilty of a criminal act. We may not abdicate our judicial responsibility to ensure that criminal statutes are enforced in the manner Congress intended and in line with the Constitution's guarantee of due process merely because a prosecutor has some creative argument as to why the statute may be stretched to an almost obscene degree.

[12] The Latin phrase *pars pro toto*, "part for the whole," best describes the government's error here. The fallacy is confusing an aspect of the thing for the thing itself, specifically here, it is incorrect to conclude that because a "wooden match stick" could, in some circumstances, *cause* "fire," that it *is* "fire."

constitutes "us[ing] fire" within the meaning of § 844(h)(1), then a drug addict in possession of more than five grams of crack-cocaine, using a match to light his crack pipe, would be subject to a ten-year enhancement because he used fire to commit his felony drug offense. Likewise, operating, or even working in, a "chop shop" that uses tools like the thermal lance to take apart stolen cars would trigger a similar enhanced sentence. Manufacturing methamphetamine (or "cooking meth"), which is often done by using a burner, would be punished far more harshly if a gas burner rather than an electric stove were used, even though either may be employed to make the same drug. Even destroying evidence by burning it in a fireplace or incinerator would subject the defendant to an enhanced penalty of 10 years or more that could not be imposed had he chosen a different method of destruction. Applying the mandatory ten- or twenty-year penalty enhancement to such conduct would be absurd.

The Second Circuit likewise found the logical extension of the government's position in *Graham* to be untenable because it "would mean that the getaway driver in every bank robbery would be subject to § 844(h)" because the internal combustion engine relies on a "mini-explosion;" likewise, any individual merely carrying a pistol cartridge during the commission of a felony, even telemarketing fraud or software piracy, could trigger the statute's enhanced penalty. 691 F.3d at 161, 163. The absurd results sought by the government in *Graham* and the case before us simply constitute one more reason to reject its position—one leading to clearly unforeseen and undesired results by punishing conduct that Congress did not intend—in favor of the more common sense interpretation that Congress intended.

**IV.**

Equally relevant, the purpose, context, and history of the statute make clear that it was not intended to apply to the use of a tool such as the thermal lance that is not designed to cause fire. Rather, it was envisioned to apply to uses of fire that directly cause the harm.

Congress enacted the Anti-Arson Act of 1982, to add "fire" to the statute at issue, which previously applied only to uses of "explosives." Pub. L. No. 97-298, 96 Stat. 1319. Under the older version of the statute, federal law enforcement could prosecute arson-type crimes only when they were started by explosives, which required "extensive physical and chemical inventory of debris at the fire scene." H.R. Rep. No. 97-678, 97th Cong., 2d Sess. (July 28, 1982); *see also* 128 Cong. Rec. S4059-63 (April 27, 1982). These logistical problems caused federal arson investigators to waste valuable resources trying to determine whether a particular fire was started by explosives or by liquid accelerants, like gasoline. *See* 128 Cong. Rec. S11985-86 (Sept. 22, 1982). The Anti-Arson Act amendments, adding "fire" to several provisions of the statute, were intended to address this problem.[13]

The legislative history establishes that Congress intended "fire," as used in § 844(h)(1), to apply to uses of fire such as

---

[13] The Anti-Arson Act amended Title XI of the Organized Crime Control Act of 1970 by inserting "fire or" after "by means of" in subsections (e), (f), and (i), and by inserting "fire or" after "uses" in subsection (h)(1). The amended version of § 844(h)(1) applies to "[w]hoever [] uses *fire or* an explosive to commit any felony." Pub. L. No. 97-298, 96 Stat. 1319 (emphasis added).

burning down of buildings "to conceal homicide, and for fraud against insurance companies." H.R. Rep. No. 97-678. Congress was especially concerned with the risk to people and the costs of arson and arson-like fires. *See* 128 Cong. Rec. H4957-60 (Aug. 2, 1982) (statement of Rep. Moffett) ("[F]ire in the United States kills 8,000 people each year. It injures as many as 300,000 persons, . . . ."), (statement of Rep. Sawyer) ("The devastating crime of arson . . . costs the taxpayers billions of dollars each year and kills and injures thousands."); 128 Cong. Rec. S11985 (Sept. 22, 1982) (statement of Sen. Glenn) ("Each year arson kills 1,000 people, injures in excess of 3,000 people, causes direct property losses of at least $1.7 billion."). Clearly, Congress was concerned with the damage that fire directly causes to life and property, not with the effect of incidental sparks or a "flickering flame" on the ability to use a thermal lance or other tool.

Congress gave no indication whatsoever that it intended that the statute be used to prosecute the use of a tool such as a thermal lance that, when used in the ordinary manner, does not contemplate starting fires. Every item of legislative history reveals that Congress envisioned the "uses fire" language to be applicable to cases of substantial fire, where the fire directly does the harm, particularly where people are injured or killed, e.g. arson. *See, e.g.*, 128 Cong. Rec. H4957-60 (Aug. 2, 1982) (statements of Rep. Moffett and Rep. Sawyer); 128 Cong. Rec. S11985 (Sept. 22, 1982) (statement of Sen. Glenn). Thus, even if we accepted the government's position that the thermal lance uses fire, we would still hold that § 844(h)(1) does not apply because Congress did not envision the use of the penalty provision to punish the employment of a tool to melt metal in the course of committing a bank larceny.

**V.**

If we had any doubt remaining as to whether § 844(h)(1) penalized defendants' conduct as a use of fire to commit a felony, reversal would nonetheless be compelled by the rule of lenity.

The application of the rule of lenity is required because defendants did not have "fair warning" that their conduct was subject to the enhanced penalty of § 844(h)(1). *See McBoyle v. United States*, 283 U.S. 25, 27 (1931). The "touchstone" of this question "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

The government has sought enhanced penalties under § 844(h)(1) exclusively for arson and arson-like crimes[14] and cross-burnings as in *United States v. Wildes*, 120 F.3d 468 (4th Cir. 1997), and *United States v. Hayward*, 6 F.3d 1241 (7th Cir. 1993). The government advises us of no other case in which the use of a thermal lance (or similar device or tool)

---

[14] *See United States v. Challoner*, 583 F.3d 745 (10th Cir. 2009) (defendant used molotov cocktail to set a diversionary fire at an abandoned elementary school in order to rob a nearby bank); *United States v. McAuliffe*, 490 F.3d 526 (6th Cir. 2007) (arson in furtherance of mail fraud); *United States v. Ihmoud*, 454 F.3d 887 (8th Cir. 2006) (arson in furtherance of mail fraud); *United States v. Grassie*, 237 F.3d 119 (7th Cir. 2001) (convicted under § 844(h)(1) for felony destruction of church by fire); *United States v. Yankowski*, 184 F.3d 1071 (9th Cir. 1999) (activist that set fire to abortion clinic charged under § 844(h)(1) in violation of the Hobbs Act); *United States v. Ruiz*, 105 F.3d 1492 (1st Cir. 1997) (convicted under § 844(h)(1) for arson in furtherance of mail fraud to collect insurance proceeds).

was prosecuted under § 844(h)(1), despite there having been many criminal cases involving the use of such tools.[15] Neither the statute nor prior applications of it gave the defendants in this case fair warning that their use of a thermal lance, rather than another cutting tool, to commit a bank larceny rendered them subject to additional ten- and twenty-year penalties.

## CONCLUSION

For the reasons explained above, we conclude that defendants' use of the thermal lance does not fall within the scope of the penalty enhancement. We therefore reverse defendants' convictions under § 844(h)(1). Because defendants' conspiracy convictions under § 844(m) were predicated on the assumption that defendants' conduct fell within the ambit of § 844(h)(1), we likewise reverse the

---

[15] *See United States v. Newsom*, 508 F.3d 731 (5th Cir. 2007) (defendant not charged with § 844(h)(1) for using a "cutting torch" to open a storage unit and steal explosives); *United States v. Ross*, 43 Fed. Appx. 751 (6th Cir. 2002) (defendants not charged with enhanced penalties under § 844(h)(1) for manufacture of methamphetamine with an acetylene torch); *United States v. Barnhill*, 213 F.3d 643 (9th Cir. 2000) (unpublished) (defendants not charged with enhanced penalties under § 844(h)(1) for using cutting torches in a bank larceny); *United States v. Harty*, 930 F.2d 1257 (7th Cir. 1991) (defendants not charged with enhanced penalties under § 844(h)(1) for attempted vault larceny with an acetylene torch); *United States v. Porter*, 881 F.2d 878 (10th Cir. 1989) (defendants not charged with enhanced penalties under § 844(h)(1) for bank larceny with acetylene torch); *United States v. Molinares Charris*, 822 F.2d 1213 (1st Cir. 1987) (defendants not charged with enhanced penalties under § 844(h)(1) for use of a cutting torch to alter a bulkhead of a boat in an attempt to conceal drugs they intended to distribute); *United States v. Kupa*, No. 10–CR–65–01, 2011 WL 3555731 (E.D.N.Y. July 27, 2011) (defendant did not receive enhanced penalties under § 844(h)(1) for bank burglary with blow torch).

convictions on the conspiracy counts.  *See United States v. Barone*, 71 F.3d 1442, 1447 (9th Cir. 1995).  We vacate the sentences on the bank larceny counts and remand for resentencing.

**REVERSED, VACATED, and REMANDED.**

MURGUIA, Circuit Judge, dissenting:

The majority's holding that use of a thermal lance, when ignited to burn through and melt metal automated teller machine ("ATM") vaults during a bank robbery, does not involve the use of fire under 18 U.S.C. § 844(h)(1) is counter to the ordinary and common definition of fire.  Because defendants' use of a thermal lance to commit bank larceny constitutes the use of fire to commit a felony for purposes of 18 U.S.C. § 844(h)(1), I would affirm each sentencing enhancement.

**I.**

**A.**

Samuel Eaton devised a scheme to steal money from local banks' ATM vaults.  For the first robbery, Eaton recruited Christopher Williams, a co-conspirator who was charged separately and testified for the prosecution at trial, as well as Clinton Thompson III and Tavrion Dawson.  In order to open the metal ATM vault and steal the monies locked inside, Eaton used a thermal lance.  While Eaton used the thermal lance to melt through the vault exterior, Williams operated a makeshift extinguisher—a hand-held sprayer filled with

water—to contain the fire and prevent it from burning up the monies housed inside. Eaton and Williams absconded with approximately $80,000, leaving behind charred walls, scorched $20 bills strewn across burnt tile flooring, a vault coated with orange soot, and the pungent odor of smoke permeating the air.[1]

Less than two weeks after the first heist, Eaton, together with Williams and Thompson, committed a second bank robbery. Eaton again used a thermal lance to burn through the ATM vaults' exteriors while Williams operated a makeshift extinguisher to prevent the spread of fire and incineration of the money. This time, Eaton and Williams absconded with over $151,000, leaving behind burned out vaults and additional physical damage to the premises.

A jury convicted Thompson, Dawson, and Eaton of, among other things, conspiring to use fire to commit bank larceny in violation of 18 U.S.C. § 844(m).[2] Their sentences were increased pursuant to 18 U.S.C. § 844(h)(1), which

---

[1] The majority's contention that defendants "assiduously avoided starting a fire by spraying the ATM with water the entire time that they operated the thermal lance tool," Majority op. at 13, lacks merit in light of the condition in which the defendants left the premises. Defendants simply *contained* the fire that they started. *Cf.* Larry F. Jessus, *Welding: Principles and Applications* 211 (5th ed. 2004) (explaining that "[f]ilms have portrayed the oxygen lance as a tool used by thieves to cut into safes" but that "[i]n reality, this would result in the valuables in the safe being destroyed").

[2] A grand jury returned indictments charging defendants with bank larceny in violation of 18 U.S.C. § 2113(b), conspiracy to use fire during the commission of a felony in violation of 18 U.S.C. § 844(m), and the use of fire during the commission of a felony in violation of 18 U.S.C. § 844(h)(1).

authorizes an enhancement for anyone who "uses fire" to commit a felony that can be prosecuted in federal court. On direct appeal, Thompson, Dawson, and Eaton challenge the sentencing enhancements, contending that use of a thermal lance is not akin to "use[ of] fire" under section 844(h)(1). Their challenge should fail.

**B.**

The thermal lance, also referred to as a "'burning bar,'" Construction Industry Publications, *House Builders Health & Safety Manual* 30-7 (May 2008), consists "of a bundle of steel rods inside a steel tube . . . . Oxygen . . . is passed down the tube and the end is lit with the aid of an oxy/acetylene torch. The result is a spectacular white-hot firework flame with formidable penetrating powers." N.A. Downie, *Industrial Gases* 322 (2002); *accord* John S. Scott, *Dictionary of Civil Engineering* 455 (4th ed. 1993). To operate the thermal lance, a user squeezes a handle on the torch to commence the flow of oxygen through the tube containing the cutting rods. Then the user brings a striker plate into contact with the tip of the torch to generate a spark that reacts with the oxygen flowing inside the tube. *See also* 21 *The New Illustrated Science and Invention Encyclopedia: How it Works* 2807 (1988) (explaining that "[p]ure oxygen is blown down the tube, the core wire *catches fire*, *then burns* with intense heat." (emphasis added)).

Once ignited, the thermal lance produces a flame that burns at temperatures exceeding 10,000 degrees Fahrenheit. The flame continues to burn so long as oxygen flows through the torch and the cutting rods are not depleted. During use, the thermal lance generates sparks, splatter, and molten material. A police detective testified at trial that the thermal

lance is a dangerous tool because it incorporates a "fire factor" that burns everything with which it comes into contact. *See also* Construction Industry Publications, *supra*, at 30-7 (identifying fire as the "principal hazard associated with thermic lancing"); Neil A. Downie, *The Ultimate Book of Saturday Science* 422 (2012) ("Like any flame, the thermic lance will set fire to things that are flammable . . . ."). Indeed, oxygen-fueled thermal lances are "particularly useful for . . . igniting furnaces."[3] 17 Marshall Cavendish Corp., *How It Works: Science and Technology* 2142 (3d ed. 2003).

The thermal lance may be used to cut, pierce, and gouge metal. While these techniques suggest that a thermal lance operates in a manner similar to a saw blade, side handle grinder, or other cutting tool, the thermal lance actually interacts with a surface differently: it changes the surface's state of matter through extreme heating and melting. *See id.* (explaining that a thermal lance "uses the heat released by a substance burning in pure oxygen to cut through a material by melting it"); *see also* Clifton Smith & David J. Brooks, *Security Science: The Theory and Practice of Security* 125 (2013) (explaining that thermal lances heat metal "to the kindling or ignition temperature and rapidly oxidiz[e] it by a regulated jet of oxygen"). By way of analogy, both an ice pick and a lit candle can alter the shape of a block of ice, but only the latter can melt ice into water.

Although the thermal lance instructional manual entered into evidence "makes no mention of fire, except to warn of the *risk* that fire may result" from its use, Majority op. at 12,

---

[3] Thus, the majority's assertion that the thermal lance, "when used in the ordinary manner, does not contemplate starting fires," Majority op. at 19, is incorrect.

it contains multiple references to terms that we commonly and logically associate with the presence of fire.  These include "burn"; "burning tip"; "flame"; "ignition"; "sparkling"; "striker plate"; and "torch."[4]  For example, users are cautioned to "[a]lways wear *flame or spark resistant clothing*," "[n]ever point *the torch* at anybody," "[n]ever use any other rods as hazardous backflashes or *internal burning* may occur," and "[n]ever allow falling *sparks* or molten metal" to contact the instrument.  Moreover, users are advised that the "[r]od *sparkling indicates ignition*" and they should "[p]lace the *burning tip* of the rod against the target material" at an angle.  Use of any of these terms does not remove the fire element from a thermal lance.

## II.

Since this appeal raises a question of statutory construction and interpretation, which we address de novo, *United States v. Norbury*, 492 F.3d 1012, 1014 (9th Cir. 2007), we first look to the language of 18 U.S.C. § 844(h)(1), *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241–42 (1989).  "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979).  Thus, when the plain meaning of a statutory provision is unambiguous, that meaning controls.  *Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991); *see also Conn. Nat'l Bank v. Germain*,

---

[4] Other common synonyms for "fire," of course, are: "flame," "conflagration," "blaze," "heat," "glow," "warmth," "luminosity," "combustion," "pyre," "flare," and "inferno" (nouns); "kindle," "ignite," "inflame," "light," and "burn" (verbs); and "scorched," "smoldered," and "heated" (adjectives). *Webster's New World Thesaurus* 163 (3d ed. 2003).

503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981))).  In other words, where "the language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion." *Caminetti v. United States*, 242 U.S. 470, 485 (1917); *see also Von Eichelberger v. United States*, 252 F.2d 184, 186 (9th Cir. 1958) ("The provision of the statute under which the indictment . . . was drawn is plain and unambiguous and needs no resort to provisions of other enactments to make its meaning clear.").

## A.

Section 844(h) provides, in relevant part:

> Whoever—

> (1) uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States, . . .

> including a felony which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for 10 years.  In the case of a second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for 20 years.

18 U.S.C. § 844(h)(1)–(2) (2011).  Subsection (m) provides that a person who conspires to commit an offense under section 844(h) "shall be imprisoned for any term of years not exceeding 20, fined under this title, or both."  *Id.* § 844(m). The absence of a definition for "fire" in section 844(h)(1) requires us to attribute to "fire" its ordinary, contemporary, and common meaning.  *Perrin*, 444 U.S. at 42; *cf. United States v. Ressam*, 553 U.S. 272, 274 (2008) (analyzing 18 U.S.C. § 844(h)(2), which addresses carrying an explosive "during the commission of any felony," and concluding that there was "no need to consult dictionary definitions of the word 'during' in order to arrive at the conclusion that respondent engaged in the precise conduct described in" the statute).

Fire is an unambiguous term that does not account for variations in size, intensity, or our ability to contain it.  We have observed that "[a] common dictionary definition of fire is 'a rapid persistent chemical reaction that releases heat and light.'"  *Maffei v. N. Ins. Co. of N.Y.*, 12 F.3d 892, 896 (9th Cir. 1993).  Another lexicon defines fire as "the phenomenon of combustion as manifested in light, flame, and heat and in heating, destroying, and altering effects," *Webster's Third New International Dictionary* 854 (2002), and a third indicates that fire is "popularly conceived as a substance visible in the form of flame or of ruddy glow or incandescence," 5 *The Oxford English Dictionary* 942 (2d ed. 1989).  Strikingly absent from any of these definitions is any distinction, introduced for the first time by the majority, related to the sustainability of a flame[5] and the presence of

---

[5] The majority incorrectly construes fire to require a sustained *flame*. Majority op. at 12.  Rather, fire requires the interaction of fuel, oxygen, and heat to create a sustaining *chemical reaction* that facilitates

sparks.**[6]** Since the meaning of "fire" is not subject to debate, I must conclude that 18 U.S.C. § 844(h)(1) is unambiguous: anyone who "uses fire" to commit a felony that can be prosecuted in federal court can be charged under the statute. *Accord United States v. Hayward*, 6 F.3d 1241, 1246 (7th Cir. 1993) ("Our reading of section 844(h)(1) leads us to conclude that the intent of Congress is clearly expressed in the language of the statute."), *overruled on other grounds by United States v. Colvin*, 353 F.3d 569 (7th Cir. 2003). The majority's invocation of legislative history to illuminate the statute's meaning is therefore erroneous.**[7]**

## B.

Having concluded that 18 U.S.C. § 844(h)(1) is unambiguous and fire, in fact, means fire, I cannot ignore the glaring reality that a thermal lance incorporates every characteristic of fire. Neither could the jury, which found that

---

combustion. *See* National Fire Protection Association, *Fundamentals of Fire Fighter Skills* 128 (2004) (explaining that combustion "is a rapid, self-sustaining process that combines oxygen with another substance and results in the release of heat and light").

**[6]** What the majority characterizes as "particle-like sparks" are, in fact, fire. *See* 16 *The Oxford English Dictionary* 118 (2d ed. 1989) (defining the term "spark" as "[a] *small particle of fire*, an *ignited fleck or fragment*, thrown off from a burning body or remaining in one almost extinguished" (emphasis added)).

**[7]** The majority also errs by applying the rule of lenity to 18 U.S.C. § 844(h)(1). "Application of the rule of lenity is appropriate only when there remains 'a grievous ambiguity' in the language of the statute after a court has used every method of statutory construction to resolve it." *United States v. Wildes*, 120 F.3d 468, 471 (4th Cir. 1997). Section 844(h)(1) is devoid of any ambiguity, grievous or otherwise.

defendants used fire to commit—and conspire to commit—bank larceny. First, fire is generated from a chemical reaction that involves the presence of oxygen. *See, e.g.*, Raymond Friedman, *Principles of Fire Protection Chemistry and Physics* 255 (3d ed. 1998) (explaining that fires burning in oxygen-enriched atmospheres "not only burn hotter and faster but also, not surprisingly, are more difficult to extinguish"). Similarly, the thermal lance used by defendants could not operate without an oxygen tank that fueled the chemical reaction necessary to ignite the instrument. Second, fire is created by using friction—rubbing two sticks, striking a match, scratching the flint wheel on a cigarette lighter—to generate a spark that initiates that chemical reaction. *See, e.g.*, Arthur E. Cote & Percy Bugbee, *Principles of Fire Protection* 53 (1988) (explaining that mechanical heat energy in the form of friction frequently causes fire and observing that the "ageless procedure for starting a fire by rubbing sticks together is an example of ignition by mechanical heating"). Similarly, defendants used a striker plate, which created friction when it contacted the torch's cutting rods, to generate the spark initiating the chemical reaction that, in turn, ignited the flame. Third, fire produces a visible flame, heat, and sparks when it interacts with a substance. Similarly, the thermal lance produces a visible flame at the tip of the torch, generates heat exceeding 10,000 degrees Fahrenheit, and sparks when the torch interacts with a substance. In essence, a thermal lance is a large, industrial version of an ordinary cigarette lighter: a user ignites it, and it emits light, a flame, and heat.[8]

---

[8] The majority's attempt to liken the thermal lance to a household iron, which we do not commonly consider "uses fire" to remove wrinkles from fabric, is anemic and misplaced. The soleplate of an iron simply does not

The majority also declares that a thermal lance, which can operate underwater, cannot possibly generate fire because the latter, in its view, "would not sustain if submerged in water." Majority op. at 11 n.9.  However, fire can, in fact, burn while submerged.  *See, e.g.*, Mark W. Huth, *Residential Construction Academy: Basic Principles for Construction* 65 (3d ed. 2012) (explaining that "oxygen for an underwater magnesium fire comes from the water" and welding processes that use "pure oxygen, supplied in tanks," significantly increase the danger of fire); *see also* Friedman, *supra*, at 255–56 (discussing fires that can occur in nonatmospheric pressure environments, including underwater).

The majority's attempt to redefine "fire" defies science and runs counter to our common sense meaning and fundamental understanding of fire.  For the same reasons we ascribe the term "fire" to warmth emanating from the hearth, an uncontrolled conflagration with which firefighters contend, and light flickering from a candle, "fire" properly describes the flame emanating from a thermal lance's burning torch.  Ultimately, the majority agrees.  *See* Majority op. at 15 (conceding that a "'mini-*fire*'" burns "at the tip of the thermal lance" (emphasis added)).

## III.

In order for a district court to impose a sentencing enhancement under section 844(h)(1), the government must prove that a person "uses fire . . . to commit any felony" that can be prosecuted in federal court.  18 U.S.C. § 844(h)(1).  The Second Circuit, relying solely on the plain language of

emit light or generate a flame, and it certainly does not require combustion for operation.

section 844(h)(1), has determined that "to 'use' fire means the accused must have carried out the crime by means of fire."**[9]** *United States v. Desposito*, 704 F.3d 221, 227 (2d Cir.

---

**[9]** The majority's embracement of another Second Circuit case, *United States v. Graham*, 691 F.3d 153 (2d Cir. 2012), *vacated on other grounds*, 133 S. Ct. 2851 (2013), is wholly inapposite. In *Graham*, the Second Circuit addressed whether use of a firearm, which "expel[s] bullets by the combustion of gunpowder or other explosive material contained within the cartridge," *id.* at 160–61, constituted use of an "explosive" for purposes of 18 U.S.C. § 844(h). It answered that question in the negative.

The Second Circuit's analysis focused upon something we do not have in this case: a definition of the term at issue. Congress, the Second Circuit explained, expressly and comprehensively defined the term "explosive," *see* 18 U.S.C. § 844(j), to include "gunpowders" as part of "a list of materials" that included high explosives, detonators, detonating agents, and blasting materials, 691 F.3d at 161. "In ordinary usage," the Second Circuit reasoned,

> a person carrying a single unspent pistol cartridge in his pocket—a cartridge containing a small amount of gunpowder—is hardly deemed by virtue of this to be armed with gunpowder or an explosive. We do not think Congress intended this result, nor do we think . . . that a single 9-millimeter cartridge falls within its definition of explosive[] simply because the cartridge contains a small quantity of gunpowder—is reasonable.

*Id.* It further concluded that ammunition is not an explosive for purposes of 18 U.S.C. § 844(j) simply because it may be fired from a gun. *Id.* at 162.

*Graham*, therefore, focused upon whether "gunpowder" from a single firearm fell within the statutory definition of "explosives." This case does not present us with a similar question because section 18 U.S.C. § 844(h)(1) neither qualifies nor quantifies "fire." Where, as here, "a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228

2013). I agree. Here, there was more than sufficient evidence to convict defendants of using and conspiring to use fire during the commission of each bank robbery. As the Seventh Circuit has explained, "there is a significant difference between using fire simply to *commit* a felony and using fire to *facilitate* or *assist* in the commission of a felony." *Hayward*, 6 F.3d at 1246. The former implicates 18 U.S.C. § 844(h)(1), but the latter does not. *See id.* at 1246–47. In this case, defendants' use of the thermal lance was *integral* to their commission of the crimes because, absent fire emanating from the thermal lance torch to burn through and melt the metal ATM vaults, defendants could not access the monies they stole. *Cf. id.* at 1246–47 (distinguishing the circumstance in which a thief uses a cigarette lighter "as a light source to help him insert the key into the lock of the truck he wants to steal" and explaining that, in such a case, the lighter merely "facilitates or assists in the commission of the crime"). Defendants brought a thermal lance to the crime scene for one purpose: to ignite a flame capable of burning at an extremely high temperature that would melt the ATM vaults and enable them to extract the monies stored inside. It therefore defies logic to conclude that fire is only incidental to use of the thermal lance and played no part in the actual commission of bank larceny.[10]

---

(1993) (citing *Perrin*, 444 U.S. at 42). As I explained above, fire simply means fire, and nothing in *Graham* alters that conclusion.

[10] The majority's reasoning is nonsensical. The defendants did not use the thermal lance to illuminate their path inside the banks until they reached the ATM vaults. Instead, they specifically used the intense fire emanating from the thermal lance torch to burn through the vaults and gain access to the monies stored inside. Use of the thermal lance in this case was therefore essential, not incidental, to the commission of the bank larcenies.

Congress did not limit application of a sentencing enhancement under 18 U.S.C. § 844(h)(1) to anyone who employs a particular process or utilizes a specific tool or instrument to create fire that is used to commit a felony. Despite the majority's creative efforts to recast the facts, defendants used fire, which they ignited with a thermal lance, to commit their crimes.   Nothing in section 844(h)(1) insulates defendants from sentencing enhancements simply because the fire they used emanated from the torch of a thermal lance and not from a less sophisticated fire-generating device.

Section 844(h)(1) also requires the use of fire to commit "*any* felony . . . ."  18 U.S.C. § 844(h)(1) (emphasis added). "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997).  Because Congress "did not add any language limiting the breadth of that word," *id.*, the word "any" in section 844(h)(1) refers to all, not a specific subset of, felonies.  *See Wildes*, 120 F.3d at 471 (holding that "'any felony' as used in § 844(h)(1) is not limited to offenses involving the commission of arson and therefore includes conspiracy to violate civil rights by burning a cross"); *United States v. LaPorta*, 46 F.3d 152, 156 (2d Cir. 1994) (explaining that section 844(h)(1), while "limited to fire or explosives, *sweeps more broadly*; it proscribes generally the use of these means to commit 'any' federal felony" (emphasis added)); *Hayward*, 6 F.3d at 1246 (concluding that section 844(h)(1), with "simple, clear terms[,] . . . does not limit itself to the prosecution of arson cases").  A defendant who uses fire to commit any federal

felony, therefore, may be charged with violating 18 U.S.C. § 844(h)(1).[11]

The executive branch is responsible for investigating and prosecuting crime. Whether fire is used to commit a felony depends upon the facts surrounding the commission of each crime. The task of deciding whether a case involves potential violations of 18 U.S.C. § 844(h)(1) and (m) falls upon the federal prosecutor, who possesses broad discretion to determine what charges to bring. *See United States v. Kidder*, 869 F.2d 1328, 1335 (9th Cir. 1989). Such discretion, the Supreme Court observed, "is an integral feature of the criminal justice system, and is appropriate, so long as it is not based upon improper factors." *United States v. LaBonte*, 520 U.S. 751, 762 (1997). While a prosecutor's discretion is not unfettered, *see Abuelhawa v. United States*, 556 U.S. 816, 823 n.3 (2009); *Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1978), the majority's speculation about hypothetical prosecutions is inappropriate. *See United States v. Severns*, 559 F.3d 274, 287–88 (5th Cir. 2009) (concluding that "Supreme Court precedent requires us to consider only the elements of use of fire and the particular predicate offense at issue rather than any possible use of fire to commit any conceivable felony" and emphasizing that "courts must engage in realistic probabilities, not theoretical possibilities, in determining how statutes might be violated"). Since defendants unequivocally used—and conspired to use—fire to commit bank larceny, their prosecution under and the

---

[11] Such felonies include, but are certainly not limited to, mail fraud, *see United States v. Beardslee*, 197 F.3d 378, 384 & n.3 (9th Cir. 1999), bank larceny, and tampering with evidence, *see Desposito*, 704 F.3d at 224 & n.3.

sentencing enhancements they received in accordance with 18 U.S.C. § 844(h)(1) were proper.

## CONCLUSION

When it enacted 18 U.S.C. § 844(h)(1), Congress determined that anyone who "uses fire" to commit a felony that can be prosecuted in federal court is eligible for a sentencing enhancement. Our common, contemporary understanding of fire—a chemical reaction producing light, heat, and a flame—has remained unchanged throughout human history. The flame generated by a thermal lance, which is fueled by an oxygenated chemical reaction that produces light and burns at over 10,000 degrees Fahrenheit, falls within the plain meaning of "fire."

Defendants used—and conspired to use—fire, which they ignited and controlled with a thermal lance, to commit bank larceny by burning and melting metal ATM vaults. Without use of the fire generated by a thermal lance, defendants' scheme to steal monies secured inside those vaults would have gone up in smoke. Since 18 U.S.C. § 844(h)(1) allows for sentencing enhancements under these facts, I would affirm each sentence.[12]  Accordingly, I respectfully dissent.

---

[12] Whether the resulting sentences are overly harsh is not a question for us to decide.